UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LIONEL SINGLETON, JR.                    CIVIL ACTION

VERSUS                                   NO: 19-2684

UNITED STATES OF AMERICA                 SECTION: "J"(3)

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the Court for a bench trial on the merits on October 13, 2020. After consideration of the testimony and evidence submitted, and the arguments of counsel, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

1.  The Court has jurisdiction over this matter, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2671, *et seq.*

2.  Lionel Singleton, Jr., is 45 years old and was an offshore operator in the oil and gas industry, which is a position he has held with multiple oil and gas companies over a 20-year career.

3.  On March 30, 2017, Singleton was injured in a vehicular accident when he was struck from the rear by U. S. Postal Service employee Donnelle Breaux acting within the course and scope of her employment.

4.  At the time of the accident, Singleton's vehicle was stopped at a red traffic signal and the impact knocked his vehicle into a third vehicle stopped ahead of him.

5.  Pursuant to a *Motion for Partial Summary Judgment* disposed of prior to trial, Breaux was found to be solely liable for the accident. The issue of liability was not litigated at trial.

1

6.     Mr. Singleton experienced an immediate onset of neck and low back pain.

7.     Shortly afterward, when his symptoms worsened, Plaintiff saw Dr. Dantin, his family doctor, several times complaining of shoulder, neck and back pain.

8.     On May 11, 2017, Plaintiff began treating with Dr. Beau Porche, a chiropractor in Houma, Louisiana, for persistent neck pain radiating into his shoulder and low back pain radiating into his hips.

9.     Dr. Porche reported segmental dysfunction in the cervical and lumbar regions, as well as spasm in the cervical and lumbar paraspinal musculature. The records of Dr. Porche confirm treatment and diagnosis through October 24, 2017.

10.    A lumbar MRI performed on August 7, 2017, confirmed a "left far lateral/foraminal disc herniation at L4-5 which narrows the left neural foramen and could produce symptoms relative to the left L4 root."

11.    On September 8, 2017, Plaintiff was referred to Dr. Michael Haydel, a pain management specialist in Houma, Louisiana, with complaints of persistent low back pain. Plaintiff also voiced complaints of left shoulder pain. Mechanism of injury is reported as "motor vehicle accident."

12.    Between September and November, 2017, Plaintiff underwent multiple lumbar epidural steroid injections by Dr. Haydel. Dr. Haydel also prescribed medication for neuropathic pain. Dr. Haydel noted mechanism of injury as "motor vehicle accident."

13.    On January 18, 2018, Plaintiff was seen by Dr. Deepak Awasthi, a neurosurgeon, complaining of moderate to severe "throbbing" and "shooting" pain in his neck and low back. At that time, Dr. Awasthi discussed treatment options with Plaintiff, including surgical intervention in the form of a L4-5 discectomy.

14.    On June 14, 2018, Plaintiff returned to Dr. Awasthi with complaints of left- sided low back pain radiating into the left leg and foot, which Dr. Awasthi reported was the product of a L4-5 lumbar disc herniation with

radiculopathy. At this visit, Plaintiff indicated his desire to proceed with lumbar surgery.

15. At this June 14, 2018 visit, Plaintiff also complained of left-sided neck pain radiating into the left arm. He again reported that these problems began following a March 2017 automobile accident.

16. Dr. Awasthi performed a left-sided L4-5 facetectomy, partial discectomy and resection with decompression of the nerve roots on August 8, 2018.

17. On August 23, 2018, Plaintiff's first post-operative visit, he reported ongoing symptoms which Dr. Awasthi reported to be "neuropathic … in the L5 distribution."

18. On November 15, 2018, Plaintiff returned to Dr. Awasthi reporting continued low back pain and significant left leg pain, which Dr. Awasthi reported to be "neuropathic in nature." Dr. Awasthi maintained this opinion at a visit on November 15, 2018 when Plaintiff returned reporting low back and leg pain, which he rated 8 out 10.

19. On December, 12, 2018, Plaintiff underwent a repeat lumbar MRI, which confirmed "postoperative scar/fibrosis" at the L4-5 level.

20. On December 17, 2018, Plaintiff returned to Dr. Haydel complaining of persistent lower back pain radiating into both legs. In fact, Plaintiff reported his pain as being "worse than before surgery." Plaintiff reiterated these complaints to Dr. Haydel on January 14, 2019. Dr. Haydel maintained Plaintiff on neuropathic pain medication.

21. On December 20, 2018, Plaintiff continued to voice complaints of local low back pain as well as pain radiating into his lower extremities. Upon review of Plaintiff's recent lumbar MRI, Dr. Awasthi reported he felt Plaintiff's pain generator was "postoperative changes with epidural fibrosis on the left side at L4-5."

22. As Dr. Awasthi felt these symptoms were residual neuropathic pain related to nerve damage, he thought Plaintiff might benefit from a dorsal column stimulator and referred Plaintiff back to Dr. Haydel for consideration of such a procedure.

23. On February 4, 2019, Plaintiff returned to Dr. Haydel complaining of low

3

back pain radiating down both legs with numbness. Plaintiff repeated these complaints to Dr. Haydel on February 25, 2019. Dr. Haydel maintained Plaintiff on neuropathic pain medication.

24. On April 8, 2019, Plaintiff continued to complain of low back pain with bilateral lower extremity weakness impairing his daily activities. Plaintiff advised Dr. Haydel that he had been unable to obtain an EMG that had been ordered "because he lost his job and would have to pay out of pocket." Dr. Haydel reported Plaintiff may benefit from additional lumber epidural steroid injections, and again prescribed neuropathic pain medication.

25. A lumbar epidural steroid injection was performed on May 22, 2019. On May 29, 2019, Plaintiff reported to Dr. Haydel that he experienced minimal relief with the injection and continued to experience radiating low back pain and bilateral lower extremity weakness. He was maintained on neuropathic pain medication.

26. On June 18, 2019, Plaintiff returned to Dr. Haydel with persistent complaints of low back pain radiating into both legs. On August 27, 2019, Plaintiff yet again voiced complaints of radiating low back pain, but primarily into the left buttocks and left leg. These complaints were reiterated to Dr. Haydel on September 3, 2019. Throughout this period of treatment, Dr. Haydel continued to prescribe neuropathic pain medication and note "mechanism of injury includes motor vehicle accident."

27. On September 27, 2019, Plaintiff again returned to Dr. Porche with continued complaints of persistent and gradually worsening neck pain.

28. Plaintiff underwent a cervical MRI on September 30, 2019, which confirmed a "central focal disc herniation with cord effacement" at the 4-5 cervical level.

29. On October 3, 2019, at the request of Defendant, Plaintiff underwent an independent medical examination by neurosurgeon Dr. Najeeb Thomas. Dr. Thomas opined that Plaintiff had sustained the L4-5 lumbar disc herniation observed on MRI in the accident of March 30, 2017, and the L4-5 partial discectomy, facetectomy and resection with decompression performed by Dr. Awasthi was both necessary and medically reasonable. Dr. Thomas said that Plaintiff was restricted to light duty due to his

4

lumbar injury and surgery.

30.   Dr. Thomas agreed that Plaintiff's ongoing post-surgical low back and leg pain was residual pain from Plaintiff's L4-5 disc herniation and subsequent surgery. Dr. Thomas felt that Plaintiff had reached maximum medical improvement with respect to his low back.

31.   With respect to Plaintiff's cervical spine, Dr. Thomas agreed the prior cervical MRI did confirm a disc herniation at the C4-5 level. However, he did not feel the herniation was accident-related nor that it was symptomatic, *i.e.*, that it was the cause of Plaintiff's complaints of neck and upper extremity radiating pain.

32.   Dr. Thomas testified that he felt Plaintiff was honest and forthright in relaying his symptoms and history and did not feel Plaintiff was exaggerating his problems or malingering. Moreover, again, Dr. Thomas testified that he agreed a restriction to light duty employment was reasonable in light of Plaintiff's lumbar injury and resulting lumbar surgery.

33.   On October 23, 2019, Plaintiff presented to Dr. Haydel with continued complaints of radiating low back pain for which Dr. Haydel suggested the dorsal column stimulator Dr. Awasthi had previously indicated should be considered. Plaintiff also reported cervical pain radiating into his left shoulder and left hand. With respect to these renewed complaints of cervical problems, Dr. Haydel again reported the mechanism of injury to be a "motor vehicle accident."

34.   These complaints were reiterated to Dr. Haydel on November 20, 2019. Dr. Haydel reported "cervical herniation noted on cervical MRI" and was of the **further opinion Plaintiff suffered from "cervical disc disorder at C4-5 level with radiculopathy." He maintained Plaintiff's regimen of neuropathic pain medication for his ongoing low back and left leg pain.**

35.   However, because at this time Plaintiff's radiating back pain was worse than his cervical issues, Plaintiff elected to undergo the dorsal column stimulator procedure. He presented to Dr. Haydel on November 22, 2019, to discuss the necessary pre-procedure psychological testing.

36.   However, shortly after this visit, Plaintiff began experiencing a severe worsening of his cervical and upper extremity pain and numbness that

caused such concern that Plaintiff decided to delay the dorsal column stimulator procedure and address these cervical issues first.

37.  On December 3, 2019, Plaintiff underwent a cervical epidural steroid injection at the hands of Dr. Haydel, which offered little relief. Plaintiff returned to Dr. Haydel on December 18, 2019, reporting "severe neck pain with shocking sensation down to legs when he looks down." As this was a more significant concern, Plaintiff and Dr. Haydel elected to delay the stimulator procedure. Dr. Haydel reported neuropathic pain medication had been tried.

38.  On January 1, 2020, Plaintiff returned to Dr. Awasthi complaining of "worsening neck pain that radiates in the left arm" as well as "occasional numbness in the left arm and hand." Dr. Awasthi reported that Plaintiff "states that the pain becomes worse and goes down the spinal column when he looks down."

39.  Dr. Awasthi further reported that Plaintiff had undergone both physical therapy and cervical injections without success. Plaintiff reported that these worsening cervical problems were now interfering with his activities of daily life. Plaintiff further reiterated his persistent radiating low back pain.

40.  Because Plaintiff's cervical symptoms had grown significantly worse than his persistent low back and left leg pain, and because Dr. Awasthi was of the opinion Plaintiff had sustained a C4-5 central disc herniation with disc fragments intruding into the central spinal canal and effacing the spinal cord which confirmed "early signs of spinal cord compression", Dr. Awasthi recommended and scheduled Plaintiff for a C4-5 disc arthroplasty.

41.  At a January 21, 2020, visit, Dr. Haydel noted Plaintiff had been seen by Dr. Awasthi and cervical surgery had been recommended. Moreover, Dr. Haydel reported that Plaintiff "is still interested in [spinal column stimulator] for back and [bilateral lower extremity pain]."

42.  On February 18, 2020, Plaintiff underwent a C4-5 arthroplasty at the hands of Dr. Awasthi in an effort to alleviate his cervical and radiating upper extremity pain. On March 2, 2020, Dr. Awasthi reported that the procedure had resolved Plaintiff's left arm pain.

6

43.   On March 11, 2020, Plaintiff returned to Dr. Haydel again reporting neck pain radiating into his left shoulder, arm and hand, in addition to continued back pain radiating into his left leg.

44.   On April 16, 2020, Plaintiff reported mild posterior neck pain but no arm pain to Dr. Awasthi.

45.   At a May 6, 2020 return visit to Dr. Haydel, Plaintiff reported improving neck pain radiating into left arm and hand, in addition to continued low back pain radiating into the left leg. Dr. Haydel indicated at that time that neuropathic pain medication had been tried and that he would proceed with a dorsal column stimulator trial.

46.   On June 29, 2020, Dr. Awasthi reported Plaintiff was doing well from the cervical surgery, and Plaintiff's "main issue" at that time was low back pain radiating into the left leg and foot.

47.   On July 13, 2020, Plaintiff reiterated these complaints to Dr. Awasthi.

48.   One day later, on July 14, 2020, Dr. Haydel indicated Plaintiff had scheduled and would soon undergo additional psychological testing in advance of the trial stimulator procedure which Dr. Haydel continued to feel was appropriate in light of Plaintiff's "chronic [low back pain] radiating to [lower left extremity]."

49.   On August 18, 2020, Dr. Haydel reviewed the trial stimulator procedure with Plaintiff. Notably, at this visit Plaintiff indicated he had been experiencing spasm in the right anterior neck and jaw pain not experienced since cervical surgery. Accordingly, Dr. Haydel scheduled and performed a right sternocleidomastoid trigger point injection on August 25, 2020.

50.   On September 17, 2020, Plaintiff again advised Dr. Haydel of pain to the right neck and jaw and continued lumbar pain radiating into the left leg. Dr. Haydel scheduled the trial stimulator procedure for the following week. Plaintiff underwent the trial implant procedure at the hands of Dr. Haydel on September 21, 2020.

51.   On September 28, 2020, Plaintiff reported a 75% reduction in pain through the stimulator trial and the temporary implant was removed.

7

52. As of the October 13, 2020, trial date Plaintiff had not undergone the permanent implant procedure, although it was scheduled for November 6, 2020.

## Medical Causation

53. At the outset, it is noted that the parties agree that the L4-5 disc herniation for which Plaintiff underwent a left-sided L4-5 facetectomy, partial discectomy and resection with decompression of the nerve roots on August 8, 2018, was causally related to the automobile accident of March 30, 2017.

54. However, the causal relationship between the accident and Plaintiff's C4-5 central focal disc herniation with cord effacement as confirmed by the September 30, 2019, cervical MRI is disputed.

55. The *Lucas/Housely* presumption in favor of a plaintiff establishes a causal connection between an injury plaintiff suffered and an accident "if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition." *Maranto v. Goodyear Tire & Rubber Co.*, 650 So. 2d 757, 759-61 (La. 1995); *Fair v. Allen*, 669 F.3d 601, 605 (5th Cir. 2012).

56. In order to overcome or defeat the *Lucas/Housely* presumption, the defendant must show either 1) plaintiff was in poor health prior to the accident at issue, or 2) some other particular incident caused the injury. *Detraz v. Lee*, 2005-1263 (La. 1/17/07), 950 So. 2d 557, 560.

57. Defendant concedes that Plaintiff had no history whatsoever of cervical injury or problems prior to the accident of March 30, 2017.

58. Plaintiff described right-sided neck and low back pain when he sought treatment from his primary care physician, Dr. Kirk Dantin, on April 11, 2017.

59. Plaintiff described headache, right-sided neck pain, right-sided shoulder pain, and low back pain radiating into both hips when he sought treatment from his chiropractor, Beau Porche, D.C., on May 11, 2017.

60. Plaintiff did not describe left-sided shoulder pain until nearly three months after the accident.

61. Dr. Haydel testified that Plaintiff "denied neck pain" at every visit until October 23, 2019.

62. Dr. Haydel testified that his staff performed a physical examination at every visit, and Dr. Haydel's records indicate Plaintiff had full range of motion in his neck at every visit until October 23, 2019.

63. Dr. Haydel provided a narrative of Plaintiff's post-accident condition, course of treatment, and prognosis to a disability insurer in February 2019 but made no mention of neck, shoulder, or cervical issues in the narrative.

64. Plaintiff's neurosurgeon, Dr. Deepak Awasthi, performed a physical examination of Plaintiff during their initial encounter on January 18, 2018 and found his neck to be "supple, [with] full range of motion".

65. Dr. Awasthi testified that he found "no major issues" with Plaintiff's neck during the examination performed on January 18, 2018.

66. Neither Dr. Awasthi, Dr. Haydel, nor Dr. Dantin, ever ordered a cervical MRI.

67. Plaintiff's chiropractor did not order a cervical MRI until 30 months after the accident.

68. Dr. Haydel's staff did not order an epidural steroid injection (ESI) for Plaintiff's cervical spine until 33 months after the accident.

69. Dr. Awasthi did not diagnose Plaintiff with a cervical herniation until 34 months after the accident.

70. **Dr. Awasthi's stated that Plaintiff showed only "early signs of spinal cord compression" in his cervical spine when he examined Plaintiff 34 months after the accident, on January 16, 2020.**

71. Dr. Awasthi testified that he could not say to a reasonable degree of medical certainty that the March 30, 2017 accident caused Plaintiff's

later cervical complaints.

72.   Dr. Thomas testified that the March 30, 2017 accident did not cause Plaintiff's later cervical complaints.

73.   As Plaintiff has failed to produce evidence that Plaintiff's C4-5 disc herniation **continuously** manifested following the accident of March 30, 2017, the *Lucas/Housely* presumption does not apply, and the Court finds that the upper extremity radiating pain is not related to or caused by the accident of March 30, 2017.

74.   In addition, Plaintiff alleges that he suffers from an injury or aggravation at the L5-S1 level of his lumbosacral spine.

75.   Both Dr. Thomas and Dr. Awasthi testified that the changes at the L5-S1 level were degenerative in nature, and Plaintiff's own expert, Dr. Awasthi, opined that the degenerative changes at L5-S1 pre-existed the accident.

76.   Accordingly, the Court concludes that the changes at the L5-S1 level of Plaintiff's lumbosacral spine were not causally related to the accident, and thus, Defendant is not liable for any scans, tests, or treatment directly related to those changes.

**Appropriateness of Medical Treatment**

77.   Defendant does not dispute the medical necessity and appropriateness of the lumbar surgery Plaintiff underwent on August 8, 2018.

78.   However, Defendant does dispute that Plaintiff required any additional medical treatment with respect to his lumbar spine beyond at least his October 3, 2019, examination at the hands of Dr. Thomas. Specifically, Defendant disputes the need for and medical appropriateness of the dorsal column stimulator trial or permanent procedure.

79.   Notably, Dr. Thomas testified that he does not doubt Plaintiff's continued complaints of low back and radiating lower extremity pain as a result of the accident and his subsequent lumbar surgery. He testified Plaintiff at all times presented as honest and forthright, and evidenced no signs of symptom magnification or exaggeration. He simply was not convinced at the time of his October 3, 2019, examination that the low

back and left leg pain Plaintiff admittedly continued to experience is neuropathic or otherwise of a nature that would be relieved by virtue of a dorsal column stimulator.

80.   However, Dr. Thomas also testified that if the trial stimulator procedure were to provide Plaintiff the requisite threshold of pain relief, this fact would weigh in favor of the conclusion that Plaintiff's pain is indeed neuropathic.

81.   Both of Plaintiff's treating physicians, Dr. Awasthi and Dr. Haydel, reported they are of the opinion that the nature of Plaintiff's ongoing low back and left leg pain is neuropathic.

82.   Pursuant to Louisiana law, the diagnosis and opinions of a plaintiff's treating physicians are entitled to greater weight than those of doctors who examined the plaintiff for only litigation purposes. *Schouest v. J. Ray McDermott & Co.*, 411 So. 2d 1042, 1044 (La. 1982); *Fair*, 669 F.3d at 605.

83.   In addition, this Court finds credible and accepts Plaintiff's testimony that the trial stimulator procedure effectively reduced his low back and radiating left leg pain by 75%.

84.   Accordingly, this Court finds that Plaintiff has established that his ongoing low back and lower extremity pain is neuropathic in nature, and further finds that the trial and permanent dorsal column stimulator procedures are both appropriate and medically reasonable treatments with respect to Plaintiff's ongoing low back and radiating lower extremity pain.

## **Damages**

85.   Again, Plaintiff testified that he has 3 (three) children, a 12-year-old son and twin 8 (eight) year-old daughters. He testified that his injuries and resulting physical limitations have severely limited his inability to interact with his wife and children and participate in recreational activities.

86.   With respect to his relationship with his wife, Plaintiff testified there has been a considerable lack of intimacy due to pain and his considerable prescription medication program. They are also unable to enjoy

gardening and other activities enjoyed prior to Plaintiff's injuries.

87.   With respect to his children, Plaintiff testified that his son, like all teenage boys, has an interest in playing basketball, football and baseball. Due to his physical limitations, Plaintiff testified he is unable to practice with his son or otherwise participate in these activities with him. As to all of his children, Plaintiff testified they are no longer able to vacation and enjoy other family activities, such as going to the zoo, the movies or amusement parks.

88.   Plaintiff also testified that accident-related pain and resulting treatment have interfered with his activities of daily living.

89.   Plaintiff's wife likewise testified that Plaintiff's injuries have had a negative impact on their intimate relationship, has prevented Plaintiff from enjoying recreational activities with his family and has interfered with his activities of daily living.

90.   A review of similar cases involving lumbar injuries is instructive in determining the appropriate general damage award for Plaintiff's herniated lumbar disc and resulting treatment. *Barto v. Shore Construction, LLC*, 801 F.3d 465 (5th Cir. 2015) (The court found an award of $400,000 was appropriate where plaintiff's lumbar injury and subsequent surgery resulted in continued pain and "permanent restriction of normal living – normal life activities and so forth."); *Hollenbeck v. Oceaneering Int'l, Inc.*, 685 So. 2d 163 (La. App. 1st Cir. 1996), (An award of $350,000 was deemed appropriate where a relatively young plaintiff would continue to endure pain for the rest of his life and suffered a vast change in lifestyle brought upon by his lumbar injuries and resulting surgery.); *Burch v. SMG, Schindler Elevator Corp.*, 191 So. 3d 652 (La. App. 4th Cir. 2016) (Award of $400,000 deemed appropriate where plaintiff continued to suffer from continued pain following L5-S1 hemilaminectomy and medial facetectomy and would require future treatment.); *Jordan v. Intercontinental Bulktank Corp.*, 621 So. 2d 1141 (La. App. 1st Cir. 1993) (General damage award of $400,000 made where plaintiff underwent laminectomy and continued to suffer from severe pain limiting his physical activities.); *Andrews v. Mosley Well Service,* 514 So. 2d 491 (La. App. 3rd Cir. 1987) (Court upheld award of $400,000 where plaintiff, following back surgery, continued to suffer from stiffness and pain in his back and leg and could not return to manual labor.).

91.     Upon review of similar lumbar injuries requiring surgery whereafter the plaintiff continues to suffer from radiating low back pain limiting the plaintiff's activities, this Court finds that an award of $400,000 in general damages for Plaintiff's lumbar injuries and ongoing pain is appropriate.

### Medical Expenses

92.     A review of Plaintiff's accident and injury related medical expenses confirm medical expenses incurred through trial as follows:

Accordingly, the Court awards past medical expenses of $130,372.11.[1]

| | | |
|---|---|---|
| Dr. Dantin | $ | 994.00 |
| Dr. Porche | $ | 12,437.00 |
| Dr. Awasthi | $ | 3,842.00 |
| Dr. Haydel | $ | 15,872.00 |
| TRMC | $ | 28,668.02 |
| WALGREENS | $ | 1,443.49 |
| CVS | $ | 92.60 |
| Anesthia Assoc. | $ | 1,560.00 |
| Imaging Ctr | $ | 1,400.00 |
| Sothern Ortho | $ | 2,002.00 |
| Thib. Reg. Network Devlop. Corp. | $ | 2,211.00 |
| Gulf Coast | $ | 59,850.00 |

93.     Moreover, when the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. *Menard v. Lafayette Ins. Co.*, 31 So. 3d 996 (La. 2010).

94.     The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the

---

[1] The Court reduced Plaintiff's suggested medical expense damages by removing any expenses directly related to Plaintiff's C4-5 disc herniation and L5-S1 degenerative changes.

future medical expenses will be medically necessary. *Highlands Ins. Co. v Missouri Pacific R. Co.*, 532 So. 2d 317 (La. 1989). It is well acknowledged that an award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty. *Highlands*, 532 So. 2d at 324. It follows, therefore, such awards "generally do not involve determining amounts, but turn on questions of credibility and inferences, i.e., whose experts and other witnesses does the jury believe." *Menard*, at 1006.

95.   When the record sufficiently establishes the need for future medical care, but not the exact cost of such care, "the factfinder may make a reasonable award." *Lacy v. ABC Ins. Co.*, 712 So. 2d 189 (La. App. 4th Cir. 1998).

96.   In considering the appropriateness of an award of future medical expenses in the present case, this Court finds instructive *Hall v. Folger Coffee Co.*, 857 So. 2d 1234 (La. App. 4th Cir. 2003). In *Hall,* the trial court awarded the plaintiff $100,000 in future medical expenses upon finding the plaintiff had incurred $70,627.79 in past medical expenses, and further concluding a preponderance of the evidence offered at trial indicated plaintiff would require a dorsal column stimulator procedure in the future even though no evidence of projected cost of the procedure had been submitted at trial. The future medical expense award was found to have been appropriate and upheld on appeal.

97.   In the present case, Plaintiff did not undergo the trial stimulator procedure until September 21, 2020. The results of the trial procedure were not known until September 28, 2020, when Plaintiff returned to Dr. Haydel to have the trial device removed and relay his degree of pain relief. As indicated, Plaintiff is scheduled to undergo the permanent implantation procedure on November 6, 2020, well after the trial of this matter.

98.   As the evidence presented persuades the Court the trial dorsal column stimulator procedure was both a reasonable and necessary treatment for addressing Plaintiff's neuropathic pain, it is likewise reasonable to assume the permanent procedure is appropriate, will offer Plaintiff similar relief, and that Plaintiff will undergo that procedure on November 6, 2020, as scheduled.

99.   From a review of past medical expenses and a recognition that the

14

permanent stimulator device will be more costly and require periodic adjustment and maintenance, and further that periodic physician visits will be necessary in this regard, the Court awards $250,000 in future medical expenses as a reasonable minimum amount Plaintiff will incur in future medical expenses.

## Loss of Earning Capacity

100.  Plaintiff has worked in the offshore oil and gas industry for more than 20 years as an offshore operator for companies such as Chevron and Danos & Curole. Plaintiff held the position of offshore "A Operator" with Wood Group at the time of accident at issue. However, he testified he has also held the position of lead offshore operator in the past.

101.  Plaintiff began his employment with Wood Group in 2015 and worked a 14 and 14 schedule at a rate of pay of $36 per hour, and $54 per hour when working overtime hours. As is typical in the oil and gas industry, Plaintiff would regularly "work over" and take advantage of other overtime opportunities available to him.

102.  Earnings records confirm Plaintiff consistently increased his earnings annually over the course of his tenure with Wood Group until being restricted from returning to offshore employment following lumbar surgery.

103.  Moreover, it is not disputed that Plaintiff was an experienced, consistent, and reliable employee who Wood Group representatives have testified would be eligible for rehire were he capable of meeting the demands of offshore employment.

104.  Plaintiff testified that he was released by Wood Group for his failure to return to work following his lumbar surgery. At the time of this separation, Plaintiff had not been released by his doctors to return to work in any capacity.

105.  Plaintiff testified that he is confident he would have maintained his employment with Wood Group had it not been for the March 30, 2017, accident.

106.  Once Plaintiff felt he had sufficiently recovered, and due to mounting financial obligations, Plaintiff began contacting individuals with whom

he had formed relationships over his career.  In doing so, Plaintiff learned that Kosmos Energy, a company for which he had worked during his employment with Wood Group, was creating a new land-based control room position in Houston pursuant to a contract with PDI Solutions, Inc.

107.   Plaintiff took the initiative and contacted a PDI representative whom he had never met to discuss this newly created position. Significantly, this newly created position did not require a pre-employment physical. While the position did require a pre-employment and perhaps ongoing drug screens, Plaintiff asked his physicians to reduce and/or modify his prescription medication to accommodate these drug screens.

108.   Because Kosmos knew Plaintiff through prior employment, they approved PDI filling this newly created position with Plaintiff.

109.   On July 10, 2019, after his lumbar surgery, Plaintiff began working for PDI Solutions, Inc. as a 14 and 14 land-based control room operator in Houston, Texas. Though not ideal, Plaintiff testified sought and accepted the position as he is the only wage earner in his household, had exhausted his savings and 401(k), and was no longer able to borrow from family and friends.

110.   Plaintiff's rate of pay with PDI was $36 per hour, increasing to $54 per hour with overtime. While employed with PDI, Plaintiff worked 40 hours per week regular time and 44 hours per week overtime. This position did not offer Plaintiff the opportunity to "work over" or otherwise work additional overtime as Plaintiff had been able to do with Wood Group and other offshore employers. In addition, this position offered no room for advancement with PDI.

111.   Plaintiff testified that the drive to and from Houston was excruciating, requiring him to stop multiple times along the way to stretch and otherwise move around due to severe back pain.

112.   However, on May 4, 2020, Plaintiff was released from PDI citing a "reduction in force."

113.   Plaintiff testified that this PDI position was a one-time opportunity and despite diligently searching for comparable employment since his release, he has been unable to locate a comparable position.

16

114. Mr. Falcon testified that had Plaintiff been able to qualify for offshore employment, he would have attempted to place Plaintiff in an offshore position rather than release him from PDI's employment.

115. Following his release from PDI, Plaintiff consistently monitored the availability of operator positions by posting his resume on employment websites. Although Plaintiff regularly received notifications of openings, all required offshore eligibility or the appropriate pre-employment physical, or both. The physical demands of all operator position openings exceeded Plaintiff's physical abilities.

116. Again, the parties agree that Plaintiff is restricted to only light duty employment as a result of his lumbar surgery which the parties agree was medically appropriate. Moreover, the parties agree Plaintiff was physically unable to return to offshore employment in any capacity following surgery.

117. Accordingly, the Court finds Plaintiff did not fail to mitigate his damages by not requesting accommodations from Wood Group prior to his release. Again, Plaintiff was unable to work in any capacity at the time of his release from Wood Group, and certainly not in an offshore environment, regardless of accommodation.

118. Further, to the extent Defendant insists Plaintiff should have sought a position as a land-based operator upon his release from PDI, PDI representative Christian Falcon testified "to clarify on the land-based thing, these are not office type land-based positions. These are very similar in nature to offshore where they are physically climbing tanks and gauging and it's more field pipeline related work." These activities clearly exceed the light duty physical capabilities of Plaintiff.

119. A claim for lost wages need not be proven with mathematical certainty; it only requires such proof which reasonably establishes the plaintiff's claim, which includes the plaintiff's own reasonable testimony. In determining a proper future loss of earning capacity award, one factor to be considered is whether and how much Plaintiff's current condition disadvantages him in the workforce. Other factors to be considered are: the plaintiff's physical condition before the injury, the plaintiff's past work history and work consistency, the amount the plaintiff would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his

working life. *Borocco v. Ennis Inc. of Colo.*, 2003 U.S. Dist. LEXIS 10774 (E.D. La., June 16, 2003); *Miller v. Credit*, 2015 U.S. Dist. LEXIS 88433, 2015 WL 4132981 (M.D. La., July 8, 2015).

120.   In determining Plaintiff's future wage losses, the Court should look to his decreased earning *capacity* as a result of the injury and his resulting physical limitations. This is determined by deducting Plaintiff's earning *ability* immediately prior to the injury rather than by deducting his income after the injury from his income prior to the injury. *Hobgood v. Aucoin*, 574 So. 2d 344 (La. 1990).

121.   The fact finder's determination of the amount, if any, of an award of damages, including lost earning capacity, is a finding of fact. However, unlike awards for past lost earnings, awards for future income or loss of future earning capacity are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Therefore the fact finder is given much discretion in fixing these awards. Nevertheless, a projection of loss of future earning capacity must have a factual basis in the record, and an award may not be based upon speculation, possibility, or conjecture. *Lemings v. Sanasac*, 209 So. 3d 396, (La. App. 1st Cir. 2016).

122.   The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned. *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942 (5th Cir. 2012). It is well-settled that the calculation as to future lost income begins with the gross earnings of the injured party at the time of injury. *Culver v. Slater Boat Co.*, 722 F.2d 114, 120 (5th Cir. 1983).

123.   However, when a plaintiff returns to work following an accident and injury, his earnings over this period should be considered when determining wage loss. *Luwish v. Am. Marine Corp.*, 2019 U.S. Dist. LEXIS (E.D. La. 3/31/19); *Harrison v. Diamond Offshore Drilling, Inc.*, 2008 U.S. Dist. LEXIS 17120 (E.D. La. 3/6/08).

124.   The mere fact that Plaintiff's earnings at the time of injury are greater than those reflected by averaging Plaintiff's earnings over multiple prior years does not compel use of the averaged figure. *Martinez, Inc.*, 481 F. App'x 942. *See also, Hebert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044 (5th Cir. 1990).

125. Plaintiff obtained employment with Wood Group and worked consistently until being restricted to light duty following his lumbar surgery in August 2018. Although Plaintiff sustained the lumbar injury in March 2017, having no other means of income he continued to work offshore with Wood Group until this was no longer possible following his lumbar surgery in August 2018.

126. Over the course of his employment with Wood Group, Plaintiff's earnings progressively and consistently increased and would have resulted in annualized earnings of $152,236.32 in 2018 but for Plaintiff's inability to return to offshore employment with Wood Group following lumbar surgery.

127. Moreover, testimony of Wood Group representative Tiffany Gullettat confirmed that Plaintiff had applied for and been accepted into the federal MWCC program developed following the recent BP oil spill disaster. Acceptance into this program was described as both "desirable" and "exclusive" among offshore operators and is a program offshore operator strive to get accepted into.

128. By all accounts, Plaintiff was a competent, experienced and motivated employee who would have continued to excel as an offshore operator over the course of his career. Moreover, at 42 years-old, Plaintiff was in the prime of his career and extremely marketable given his 20 years of experience and exemplary performance as an offshore operator.

129. The conclusion that Plaintiff's future earning capacity has been severely impacted by what the parties agree is an appropriate light duty restriction is inescapable. Indeed, Plaintiff has clearly lost his entire offshore career as a result of the accident of March 30, 2017, accident.

130. Moreover, with his experience, work ethic, and proven capabilities, the Court finds it is likely Plaintiff would have retained employment despite the recent downturn in the oil and gas industry due to the COVID-19 pandemic. Wood Group representative Tiffany Gullett testified that Plaintiff was eligible for rehire had he not been restricted from offshore employment.

131. Mr. Falcon testified that he was Plaintiff's direct supervisor over the course of his employment with PDI. Mr. Falcon, like Ms. Gullett,

testified that Plaintiff was a capable, competent operator who would be rehired were he able to meet the physical demands of offshore employment. Indeed, Mr. Falcon testified that PDI has hired operators since the onset of the COVID-19 pandemic and he would have considered and recommended Plaintiff to fill one of these positions were he able to work offshore.

132. Indeed, even as a land-based control room operator, Mr. Falcon testified that some PDI operators worked 28 and 14 schedules, with 14 days in the land-based control room and 14 days offshore. He added that this opportunity would have been available to Plaintiff as well had he been capable of offshore employment.

133. Ms. Stephanie Chalfin, Plaintiff's vocational rehabilitation consultant, testified that she conducted an in-depth interview with Plaintiff, and obtained and reviewed records regarding his educational, work and earnings history. She also reviewed medical records and consulted with Dr. Haydel. Notably, she testified Plaintiff had also advised her that he had been experiencing neck problems since the accident.

134. According to Ms. Chalfin, Plaintiff had exhibited a "very steady work history" for someone working in the oilfield. With respect to the change of employers Plaintiff had made over his career, she testified this is not uncommon as oilfield workers often change employers seeking better pay.

135. Ms. Chalfin testified that her consultation with Plaintiff's doctors indicated he should be restricted to "sedentary to light work" and offshore employment should not be considered. She described Plaintiff as a hard worker but stated it would be hard to find employment earning wages similar to those he had earned as an offshore operator given his academic deficits confirmed by testing. She also testified that Plaintiff's skills may be transferable to other production jobs, but not to jobs beyond the oil and gas industry.

136. Moreover, she testified that when Plaintiff worked offshore, "there was a lot of overtime available." This had been the case with all of Plaintiff's prior offshore employers. Indeed, she agreed Plaintiff's earnings history confirmed he had been consistently increasing his earnings year after year prior to his release from Wood Group.

137. Finally, Ms. Chalfin testified that had Plaintiff remained in the offshore oil and gas industry he could have expected to continue to increase his annual earnings in the coming years.

138. With respect to Plaintiff's seeking out and securing his land-based control room operator position with PDI, Ms. Chalfin explained, "I think Mr. Singleton was trying to survive and support his family and I think he showed that by getting a job with PDI, which was the perfect job for him."

139. Defendant offered no vocational expert testimony to contradict the opinions of Ms. Chalfin.

140. The Court finds that Plaintiff has clearly and reliably established the capacity to earn into the future at least $152,236.32 annually but for his injury and light duty restriction, and this figure is appropriate for calculation of Plaintiff's lost wages and future earning capacity.

141. Loss of earning capacity and lost wages are distinguishable claims. Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. The trial court should consider whether and how much the plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what the plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. *Hobgood*, 574 So. 2d 344; *Levy v. Lewis*, 219 So. 3d 1150 (La. App. 4th Cir. 2017).

142. Plaintiff offered the testimony of Dr. G. Randolph Rice, a forensic economist.

143. Using the trial date of October 13, 2020 as the reference date and crediting wages earned with PDI, Dr. Rice calculated Plaintiff's after-tax wage loss to be $207,122.00.

144. Finding the calculations and testimony of Dr. Rice to more accurately reflect actual past lost wages suffered by Plaintiff, the Court awards

21

Plaintiff $207,122.00 in past lost wages.

145.   As to future losses, Dr. Rice testified that Plaintiff's future after tax earning capacity, absent injury would have been $2,304,037.00 over the next 17.15 years of work life expectancy using the trial date of October 13, 2020 as the reference date.

146.   Defendant argues that the amount that Plaintiff could earn in positions comparable to his former position at PDI should be credited against Plaintiff's future loss of earning capacity

147.   However, because the evidence presented to the Court confirms the PDI position was a newly created "one time" opportunity, and Plaintiff has been unable to secure a comparable position despite a diligent search, the Court finds that assuming Plaintiff could find employment comparable to his position at PDI would understate Plaintiff's actual future wage losses.

148.   Therefore, the Court finds that Plaintiff should be able to find employment at a rate of $20/hour and retain similar job types for the next 17.15 years. Using this figure, Dr. Rice testified that Plaintiff should be able to earn $661,250 in future income.

149.   In light of this finding and accepting the testimony of Dr. Rice with respect to Plaintiff's future lost wages, the Court awards Plaintiff $1,642,787.00 for future net loss of future earning capacity.

150.   In sum, as consequence of the accident of March 30, 2017, the Court finds Plaintiff sustained the following damages:

| | |
|---|---|
| a. General Damages | $400,000.00 |
| b. Past Medical Expenses | $130,372.11 |
| c. Future Medical Expenses | $250,000.00 |
| d. Past Lost Wages | $207,122.00 |
| e. Future Loss of Earning Capacity | $1,642,787.00 |
| **TOTAL** | **$2,630,281.11** |

New Orleans, Louisiana, this 26th day of February, 2021.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE